UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 29, 2015
```

-----------------------------------------------------X
                                 :

RONALD BERRY,                    :
                                 :

                  Plaintiff,    :        14 Civ. 3977 (KPF)
                                 :

              v.               :        OPINION AND ORDER
                                 :

COMMISSIONER OF SOCIAL SECURITY,  :
                                 :

                Defendant.  :
                                 :
-----------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:[1]

      In March 2007, several months after quitting a job that he had held for almost 17 years, Plaintiff Ronald Berry filed claims with the Social Security Administration for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging a disability that began in February 2006; his claims were denied four months later, and he did not appeal from those decisions.  Five years later, in March 2012, Plaintiff again filed for DIB and SSI benefits, this time alleging a disability that began in June or December 2006.  When those claims were denied — based on a finding that Plaintiff was not disabled under the Social Security Act (the "Act") — Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Acting Commissioner of Social Security (the "Commissioner").  The parties have cross-moved for judgment on the pleadings.

---

[1]     Andrew J. Butler, a rising second-year student at Columbia Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

For the reasons set forth in the remainder of this Opinion, Defendant's motion is denied, and Plaintiff's motion is granted in part.

## BACKGROUND[2]

### A.    Plaintiff's Proffered Ailments

Plaintiff, who was born in 1972, worked as an attendant in a parking garage from August 1989 to June 2006; his job responsibilities centered on taking tickets and collecting money from garage patrons.  (SSA Rec. 27, 116, 131).  On March 26, 2007, Plaintiff filed claims for DIB and SSI benefits with the Social Security Administration, claiming disabling impairments that began in or about February 2006.  (*Id.* at 97-106).  His claims were denied on July 25, 2007, based on the Administration's finding that Plaintiff remained capable of engaging in substantial gainful activity.  (*Id.* at 97).  No appeal was taken.  (*Id.*).

Plaintiff again filed applications for DIB and SSI on March 26 and 27, 2012, respectively, this time alleging disabling impairments since June 10 or December 31, 2006.  (SSA Rec. 81-96, 115; *see also id.* at 131).  Specifically, Plaintiff alleged that he had become disabled due to anxiety disorder, depression, panic attacks, hypertension, heart problems, arthritis, gout, insomnia, and agoraphobia.  (*Id.* at 115).[3]  During his April 29, 2013 hearing

---

[2]    The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #10) filed by the Commissioner as part of her answer.  For convenience, Plaintiff's supporting memorandum is referred to as "Pl. Br.," and Defendant's supporting memorandum as "Def. Br."

[3]    Agoraphobia is an intense fear and anxiety of being in places where it is hard to escape, or where help might not be available.  Agoraphobia usually involves fear of crowds, bridges, or of being outside alone.  Agoraphobia, National Institutes of Health, U.S. National Library of Medicine, Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/000923.htm (last visited July 27, 2015).

before an Administrative Law Judge ("ALJ"), Plaintiff testified that he was unable to return to work because of the anxiety he felt when he was around others. (*Id.* at 34-35). He feared that other people would physically hurt him. (*Id.* at 35). Plaintiff also worried about displaying symptoms of schizophrenia, with which he said his brother was afflicted. (*Id.*).

In a function report submitted to the Social Security Administration dated April 8, 2012, Plaintiff further reported experiencing insomnia, disturbing dreams, thoughts of death, and mood swings. (SSA Rec. 124-25). Plaintiff lived with his mother, and on a typical day watched television and wrote his thoughts on a computer or on paper. (*Id.* at 123-24, 127). He did not prepare his own meals because he had lost his appetite and his desire to cook. (*Id.* at 125). Plaintiff cleaned, washed laundry, and emptied the garbage, but said he did not like yardwork due to his fear of the outdoors. (*Id.* at 126). Plaintiff said that he could go out alone "[i]f [he] must!," such as to a doctor's appointment. (*Id.*). At the same time, he indicated that he could not go outside because crowds caused severe panic attacks, and he was afraid to go outside alone in the event that he fainted. (*Id.* at 126-27). Separately, Plaintiff reported having problems getting along with authority figures, because he could not "stand anyone who abuses their authority." (*Id.* at 130). He also reported problems paying attention, occasional trouble remembering things, and difficulty finishing tasks. (*Id.* at 130-31).

Plaintiff claimed to have stopped driving because of his involvement in an automobile accident and his fear of having a panic attack while driving. (SSA

Rec. 127).  He did not go shopping and relied on friends and family to shop for him.  (*Id.*).  Plaintiff reported that his ability to handle money had not changed since the onset of his disabilities, and that he was able to pay bills, count change, and handle a savings account.  (*Id.*).  He described himself as antisocial and preferred to be alone; however, he acknowledged spending time with close family and friends, and even had a fiancée.  (*Id.* at 123, 128).

In terms of physical impairments, Plaintiff related that he had trouble lifting due to a previously torn rotator cuff.  (SSA Rec. 128).  He further indicated that during gout flareups he used a cane or crutches, and had trouble standing, walking, climbing stairs, kneeling, and squatting.  (*Id.* at 128-30).  Plaintiff claimed no problems with sitting, reaching, using his hands, seeing, hearing, and talking.  (*Id.* at 129).

Also in the April 8, 2012 function report, Plaintiff stated that while he was only diagnosed with an anxiety disorder in 2006, he had suffered from the condition since the late 1990s.  (SSA Rec. 131).  Plaintiff indicated that his panic attacks occurred weekly, and that they were triggered by memories of the sudden deaths of close family members and friends, of their funerals, and of "near death" experiences.  (*Id.*).  Plaintiff stated that he "use[d] to self-medicate with alcohol" when he felt an attack coming, but that now he "stay[ed] to himself" and had been "experimenting" with prescribed medicines.  (*Id.* at 131).

To treat his conditions, Plaintiff reported taking Atenolol,[4] Sertraline,[5] and Lexapro,[6] as prescribed by his doctors.  (*Id.* at 132).  He also stated that he visited a therapist weekly and a psychiatrist at least monthly.  (*Id.*).[7]

In the claim form he submitted in March 2012, known as a Form SSA-3368, Plaintiff provided his education and work history.  (SSA Rec. 114-17).  Plaintiff received his General Equivalency Diploma ("GED") in 1990.  (*Id.* at 116).  And as noted previously, Plaintiff held one job as a garage attendant for nearly 17 years, from August 1989 until he stopped working on June 7, 2006.  (*Id.* at 115-16).  Plaintiff stated in his claim form that he stopped working because he was "taking too many days off of work for not feeling mentally able to face the outside world.  Anxiety, [p]anic, and [h]ypertension."  (*Id.* at 115).  He added that "stress and threats from work did not help[, but] [o]nly worsened [his] conditions."  (*Id.*).

---

[4]    Atenolol is in a class of medications called beta blockers that is used alone or in combination with other medications to treat high blood pressure.  Atenolol, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html (last visited July 27, 2015).

[5]    Sertraline is used to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and social anxiety disorder.  Sertraline, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited July 27, 2015).

[6]    Lexapro is the brand name of escitalopram, which is used to treat depression and generalized anxiety disorder.  Escitalopram, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html (last visited July 27, 2015).

[7]    According to the record, Plaintiff did not begin therapy until in or about January 2012.  (*See* SSA Rec. 241).

**B.      Plaintiff's Evaluations**

The crux of Plaintiff's disability claims concerns his psychological state during the relevant time period.  The record before the Court suggests that Plaintiff received little if any psychological treatment until 2012, shortly before he submitted his second set of disability claims to the Social Security Administration.  (*Compare* SSA Rec. 235 (relating Plaintiff's statement that he had never before received psychiatric treatment, taken "psych meds," or been treated at a psychiatric hospital), *with id.* at 218, 243 (relating Plaintiff's memory of therapy when he was twelve years old)).  The views of his treating and consultative professionals in 2012 and 2013 are discussed in this section.

**1.      Jewish Board of Family and Children's Services, Inc.**

**a.      Yerelyn C. Reyes, LCSW**[8]

On January 10, 2012, Plaintiff had an intake assessment with social worker Yerelyn C. Reyes at the Jewish Board of Family and Children's Services ("JBFCS").  (SSA Rec. 241-62).  While noting that he had experienced issues with anxiety and depression for some time, Plaintiff explained that he was seeking treatment because the symptoms were getting worse.  (*Id.* at 241).  He indicated, nonetheless, that he was then looking for a job.  (*Id.*).  At the time of the interview, he had been prescribed Lexapro by his primary care physician.

---

[8]      In New York State, the practice of licensed clinical social work and the use of the title "Licensed Clinical Social Worker" and the designation of "LCSW" generally requires licensure.  The practice of licensed clinical social work includes, *inter alia,* the diagnosis of mental, emotional, behavioral, addictive and developmental disorders, and disabilities.  N.Y. State Educ. Dep't, LCSW License Requirements, http://www.op.nysed.gov/prof/sw/lcsw.htm (last visited July 27, 2015).

(*Id.*).  However, Plaintiff related his propensity to consume alcohol in order to "man[]age his worries."  (*Id.*).

Plaintiff stated that he had been feeling very anxious and having more panic attacks.  (SSA Rec. 241).  He described staying home more often to avoid anxiety, especially because he worried about "crossing a wide street near his home."  (*Id.*).  He spoke of having experienced many significant losses in his life, and that he often worried about death or receiving news of another loss.  (*Id.*).  Plaintiff relayed that he had had an electrocardiogram ("EKG") in November 2011 that revealed he had suffered a "mini heart attack," which only exacerbated his worrying.  (*Id.*).  He also recalled that his symptoms worsened after he lost his job.  (*Id.*).

Plaintiff reported that he had often been "in the streets" when he was younger and that he had "witnessed a lot of traumatic events."  (SSA Rec. 251).  He stated that when he was twelve years old, his twenty-one-year-old brother "was killed by being pushed into a train track" and that "another close friend was killed in the same way."  (*Id.*).  He communicated that he had lost friends to shootings, stabbings, and brain aneurisms.  (*Id.*).  He also reported that a close friend of his had been shot and killed after a New Year's Eve party; Plaintiff found this particularly difficult because he was supposed to have been at the same party.  (*Id.*).

Ms. Reyes described Plaintiff as presenting with anxiety, depression, substance-related problems, trauma, and cognitive problems.  (SSA Rec. 241-42).  She noted that Plaintiff's symptoms included difficulty "falling asleep,"

"shortness of breath," "rapid heart beat," "chest pains," "light-headed or faint," "brooding/worry/regrets re past behavior/experience/decisions," "excessive worry re future events, or future consequences," and "difficulty controlling worries." (*Id.* at 245). She also noted a moderate risk of substance abuse. (*Id.* at 250, 253).

In her mental status evaluation, Ms. Reyes reported that Plaintiff had downcast eye contact, but was cooperative and engaging and, indeed, appeared calm and comfortable. (SSA Rec. 256). Moreover, Plaintiff was articulate and expressive, and his speech volume and rate were appropriate. (*Id.*). Ms. Reyes noted that Plaintiff appeared sad and anxious, but that both his "affect-intensity" and "affect-related to content" were "appropriate." (*Id.* at 257). Ms. Reyes described Plaintiff's thought process as "organized" and without hallucinations, delusions, or other misperceptions. (*Id.*). Plaintiff appeared distracted during the interview, but was also alert and oriented as to person, time, place, and situation. (*Id.* at 258). Ms. Reyes diagnosed Plaintiff with Anxiety Disorder Not Otherwise Specified ("NOS")[9] and assigned a Global Assessment of Functioning ("GAF") score of 55.[10] (*Id.* at 261). With respect to

---

[9]   "Anxiety Disorder Not Otherwise Specified is included for coding disorders with prominent anxiety or phobic avoidance that do not meet criteria for any of the specific Anxiety Disorders defined in this section (or anxiety symptoms about which there is inadequate or contradictory information)." AM. PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 429-36 (4th ed., text. rev. 2000) (hereinafter, "DSM-IV"), *reprinted in* ROBERT M. JULIEN, A PRIMER OF DRUG ACTION 542 (10th ed. 2005).

[10]   A GAF score of 51-60 indicates "moderate difficulty in social, occupational, or school functioning." DSM-IV 429-36, *reprinted in* SOPHIA F. DZIEGIELEWSKI, DSM-IV-TR IN ACTION 92 (2d ed. 2010). However, the utility of this metric is debatable, particularly after its exclusion from the fifth edition of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS. *See Schneider* v. *Colvin*, No. 13 Civ. 0790 (MPS), 2014 WL 4269083, at *4 & n.5 (D. Conn. Aug. 29, 2014). ("Even prior to the release of the DSM-V in 2013,

the contemplated treatment protocol, Ms. Reyes suggested a plan of outpatient treatment, psychiatric evaluation, and medication, which plan was designed to help Plaintiff manage and stabilize his mood, while decreasing significantly his alcohol intake. (*Id.* at 259).

### b.   Angela Lantz Smith, M.D.

JBFCS psychiatrist Angela Lantz Smith then evaluated Plaintiff on May 3, 2012. (SSA Rec. 216-38, *repeated at id.* at 263-85).[11]  Plaintiff reported to Dr. Smith that he was taking Lexapro as prescribed by his primary care physician. (*Id.* at 216).  Plaintiff told her that he had been having "a few drinks" five times per week, but that he did not feel this was a problem. (*Id.*).  Plaintiff noted that he was seeking employment. (*Id.*).  Plaintiff reported that he "began experiencing anxiety in his late 20s or early 30s." (*Id.*).  At some point, after experiencing difficulty sleeping, Plaintiff went to see a doctor for his symptoms. (*Id.*).  Plaintiff told Dr. Smith that an EKG exam had revealed a "mini heart attack," which caused him further anxiety. (*Id.*).  Plaintiff also remarked that losing his job in 2006[12] had worsened his symptoms. (*Id.*).

---

courts have held that an ALJ's failure to consider every GAF score is not a reversible error. . . . Since the issuance of the DSM-V, courts have become even more reluctant to find any error in the failure to consider a plaintiff's GAF scores."); *see also Mainella* v. *Colvin*, No. 13 Civ. 2453 (JG), 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) ("At a basic level, the Administration noted that '[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation.' Generally, the guidance instructs ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used." (internal citations omitted)).

[11]   Entries on the first 18 pages of Dr. Smith's report appear identical to entries on the corresponding pages of Ms. Reyes's report.  At worst, Dr. Smith obtained certain of her information from JBFCS records, rather than from Plaintiff directly.

[12]   Dr. Smith's notes erroneously state that he lost his "job of 18 years in 1986," but it is clear from Plaintiff's hearing testimony and disability report that Plaintiff lost his job of

When discussing his background and history, Plaintiff told Dr. Smith that he grew up "in the streets" and recounted several traumatic experiences, including the death of his brother and the fatal shooting of his close friend. (SSA Rec. 226).  He also relayed that he "[had] lost many friends who were shot, stabbed, and had brain aneurisms." (*Id.*).  He had "been in many fights" and "ha[d] knifed and robbed rivals." (*Id.* at 235).  He reported that "a favorite cousin was shot and left in a [sand pile] behind his [building]." (*Id.*).  This event had "preoccupied him" to the point that his friends began to call him "panic button." (*Id.*).

Plaintiff also discussed his family with Dr. Smith, noting that he had a good relationship with his father and each of his three siblings. (SSA Rec. 227).  He reported having three children, and had his first child at sixteen years old. (*Id.*).

In his conversations with Dr. Smith, Plaintiff provided further insight into his prior job as a garage attendant. (SSA Rec. 235).  He noted, somewhat curiously, that the job suited his emotional issues, because the initial garage to which he was posted was close to his home and, more importantly, because once there, he stayed in his booth and rarely interacted with others. (*Id.* at 236).  He reported that in the year prior to being fired, his "employers were 'picking on' him because he was a bit oppositional, 'macho' as he put it about having to do things not part of his job descrip[tion], or not always wearing the

---

17 years in 2006, having had it since 1989.  (SSA Rec. 27, 116; *see also id.* at 241 (same error in Ms. Reyes's notes)).

right uniform." (*Id.* at 235).  He told Dr. Smith that he had "begun calling in sick a lot due to anxiety [symptoms] to the point where he was let go," but that he had been "glad of this"; he thought he "could easily get another similar job since had [one] for 16 years," but believed that the recession combined with his "untreated and severe anxiety" problems prevented him from finding one.  (*Id.*).

Dr. Smith noted that Plaintiff's symptoms included "difficulty falling asleep," "shortness of breath," "rapid heartbeat," "chest pains," "light-headed or faint," "brooding/worry/regrets re past behavior/experience/decisions," "excessive worry regarding future events/future consequences," and "difficulty controlling worries."  (SSA Rec. 220).  She reported that Plaintiff's mood was depressed, and that his affect was composed but also anxious.  (*Id.* at 230-31).  However, Plaintiff was cooperative, engaging, and respectful; appeared calm and comfortable; spoke articulately, spontaneously, and expressively; and spoke at an appropriate volume and rate.  (*Id.* at 230).  Although he was "a bit unkempt" and "slightly [malodorous]," Dr. Smith stated that Plaintiff related well, engaged, and was overall appropriately dressed.  (*Id.* at 236).  And while Plaintiff "seemed somewhat anxious," he did not then have symptoms of a panic attack, although "he [had been] worried that he might have symptoms and not be able to come today."  (*Id.*).  Dr. Smith diagnosed generalized anxiety disorder ("GAD")[13] since Plaintiff's adolescence, post-traumatic stress disorder

---

[13]     Generalized anxiety disorder (GAD) is a mental health condition in which a person is often worried or anxious about many things and finds it hard to control this anxiety. Generalized Anxiety Disorder, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus,

("PTSD")[14] since his late 20s, and panic disorder with agoraphobia[15] since approximately age 30; she also noted a GAF of 55.  (*Id.* at 236-37).  Dr. Smith indicated that Plaintiff's prognosis was "fair," and recommended outpatient treatment, psychiatric evaluation, and medication.  (*Id.* at 233).  Dr. Smith noted that Plaintiff's memory was good, his cognition was average to above average, his insight was good, and his judgment was fair to good.  (*Id.* at 236).  She prescribed Paxil[16] and, for his panic attacks, Ativan.[17]  (*Id.*).

---

http://www.nlm.nih.gov/medlineplus/ency/article/000917.htm (last visited July 27, 2015).

[14]    Post-traumatic stress disorder (PTSD) is a mental health condition that is triggered by experiencing or witnessing a terrifying event.  Symptoms may include flashbacks, nightmares, and severe anxiety, as well as uncontrollable thoughts about the event. Post-traumatic stress disorder (PTSD), MayoClinic.com, http://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/basics/definition/con-20022540 (last visited July 27, 2015).

[15]    Panic disorder is characterized by repeated and unpredictable attacks of intense fear and anxiety.  It may also occur with agoraphobia, a fear of public places and uncontrolled situations.  Panic disorder with agoraphobia, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/imagepages/17286.htm (last visited July 27, 2015).

[16]    Paxil is the brand name of paroxetine, which is used to treat depression, panic disorder, and social anxiety disorder.  Paroxetine, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html (last visited July 27, 2015).

[17]    Ativan is the brand name of lorazepam, which is used to relieve anxiety.  Lorazepam, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html (last visited July 27, 2015).

### c.     Andrew V. Lawton, LMSW[18]

Plaintiff participated in weekly therapy sessions with Andrew Lawton, a social worker at JBFCS, for nearly a year before his ALJ hearing.  (*See* SSA Rec. 30).  In a progress note from July 13, 2012, Mr. Lawton memorialized a session with Plaintiff where the latter announced that he was having a "bad day," and was malodorous.  (*Id.* at 239).  While reporting that he was taking medications, Plaintiff also reported continued alcohol use, although he claimed that it was not excessive.  (*Id.*).  Mr. Lawton also reported that Plaintiff appeared less anxious by the session's end.  (*Id.*).

Approximately one month before the ALJ hearing, Mr. Lawton had moved, and Plaintiff had been transferred to a different therapist, Anne Ames. (SSA Rec. 30).  Mr. Lawton's professional opinions, as well as his discussions with Plaintiff about the transition in therapists, were memorialized in an "Integrative Treatment Plan Review/Change" report, dated March 16, 2013. (SSA Rec. 288-94).  Mr. Lawton related Plaintiff's statements that "heightened anxiety continues to be present," and of "feelings of depression as triggering of anxiety." (SSA Rec. 288).  He also noted Plaintiff's "rising concern of psychosis given [his] family [history] of mental illness." (*Id.*).  There were many positives in the report: Mr. Lawton noted that, over the treating relationship, Plaintiff had become "able to request help," and was "a little more comfortable with

---

[18]     In New York State, the use of the title "Licensed Master Social Worker" and the designation of "LMSW" generally requires licensure.  The position is similar to that of a licensed clinical social worker, although the latter requires at least three years of clinical experience.  N.Y. State Educ. Dep't, LCSW License Requirements, http://www.op.nysed.gov/prof/sw/lmsw.htm (last visited July 28, 2015).

expressing himself." (*Id.* at 288-89; *see also id.* at 289 (noting that Plaintiff was "euthymic [i.e., neither depressed nor highly elevated] ov[e]rall though clearly a bit anxious, a bit depressed but no [suicidal or homicidal ideations], good spontaneous speech, though catastr[o]phizes, can be talked down"). In addition, the duration of Plaintiff's panic attacks was subsiding, going from several days to several hours. (*Id.* at 288).

These were, however, counterbalanced, with several negatives: Mr. Lawton recorded that Plaintiff continued to self-medicate with alcohol, even "though he has been advised of the risks." (SSA Rec. 288). Again, Plaintiff was informed of the dangers of mixing alcohol with his prescribed medications. (*Id.* at 290). Mr. Lawton also remarked that Plaintiff was only "somewhat compliant" with taking his medicines. (*Id.*).[19]

## 2. Plaintiff's Consultative Examinations

Plaintiff's 2012 applications for disability benefits were processed, at least in part, by the New York State Office of Temporary and Disability Assistance. (*See* SSA Rec. 45 ("The determination on your claim was made by a State agency based on Social Security law and regulation. . . . Any reports given us, however, were used in making this decision.")). As part of the initial

---

[19]  Mr. Lawton also prepared a letter dated February 13, 2013, which the ALJ noted appeared to concern Plaintiff's efforts to be redesignated as "homebound" for purposes of receiving benefits through the New York City Human Resources Administration. (SSA Rec. 148). In the letter, Mr. Lawton stated that Plaintiff was his client and that he received weekly individual psychotherapy and monthly psychotropic medication since January 10, 2012. He also disclosed that Plaintiff's diagnoses were generalized anxiety disorder, PTSD, and panic disorder with agoraphobia. (*Id.*). Mr. Lawton stated that Plaintiff's "illnesses suggest that being qualified as a homebound client is appropriate at this time." (*Id.*).

evaluation of his request, Plaintiff submitted to several consultative examinations, the substance of which is summarized in this section.

### a. Howard Tedoff, Ph.D.

Clinical psychologist Howard Tedoff completed a psychiatric consultative examination of Plaintiff on May 7, 2012. (SSA Rec. 173-77). At the outset, Plaintiff stated that he had traveled to the appointment with his fiancée via public transportation. (*Id.* at 173). He told Dr. Tedoff that he did not like traveling alone and sometimes felt anxious about it, but that ultimately he could do so. (*Id.*). He complained of a poor appetite and difficulty falling asleep. (*Id.*). Plaintiff reported feeling lightheadedness and dizziness while on his medication, but Dr. Tedoff noted that his coordination was good. (*Id.*). Dr. Tedoff observed that Plaintiff's daily living activities with regards to personal grooming and hygiene were normal, and he reported helping his mother out with household maintenance. (*Id.*).

Plaintiff stated that his father was an alcoholic. (SSA Rec. 174). He also reported that he had previously used marijuana and cocaine, but that he had stopped around the year 2000. (*Id.*). Plaintiff gave his family history of schizophrenia and bipolar disorder, and told Dr. Tedoff that he suffered from anxiety, depression, and panic attacks. (*Id.*). When Dr. Tedoff asked about the frequency of his panic attacks, Plaintiff responded "too many times." (*Id.*). Plaintiff also reported that he felt agoraphobic. (*Id.*). He stated that he had hypertension and gout. (*Id.*). He disclosed thoughts of death, but not of suicide. (*Id.*). Plaintiff told Dr. Tedoff that he had seen a psychiatrist for the

first time the previous week, that he planned to see her monthly, and that he saw a therapist once per week. (*Id.*). He reported taking Lexapro, Sertraline, Atenolol, Ativan, and Paxil. (*Id.*). Plaintiff reported that his girlfriend was his only friend. (*Id.*). He stated that he avoided old friends and that many of them had moved away. (*Id.* at 173-74). Plaintiff reported that he liked to write. (*Id.* at 174).

In his mental status examination, Dr. Tedoff reported that Plaintiff was cooperative in both his demeanor and responsiveness to questions. (SSA Rec. 175). He was dressed casually with normal posture and gait, and maintained eye contact appropriately. (*Id.*). His speech intelligibility was good and his conversation was interactive, relevant, and goal-directed. (*Id.*). Plaintiff's thought processes were coherent, and Dr. Tedoff reported no evidence of hallucinations, delusions, or grossly disordered thinking, although there may have been some mild transient paranoia. (*Id.*). Plaintiff appeared tense, which was congruent with his speech and thought content. (*Id.*). Plaintiff described his mood as generally angry and sad. (*Id.*).

Plaintiff was oriented to time, place, and person; his attention and concentration were intact; and he did calculations and serial sevens to 35. (SSA Rec. 175).[20] Plaintiff was able to recall five digits forward, three digits in reverse order, and he recalled three items after five minutes. (*Id.*).[21] Plaintiff's

---

[20]   A serial sevens test is a test of concentration, which asks a patient to subtract seven from 100 and continue serially, with the patient reciting the answers one by one aloud. STEVEN L. LEWIS M.D., FIELD GUIDE TO THE NEUROLOGIC EXAMINATION 28 (2005).

[21]   The Digit Span Test is a test of attention and immediate memory that consists of orally presenting random number sequences to a patient, who then must repeat the digits in

insight was good and judgment was fair.  (*Id.*).  Dr. Tedoff estimated Plaintiff's

cognitive functioning to be near average, but with a poor fund of general

information.  (*Id.*).  Dr. Tedoff observed that Plaintiff had no movement

abnormalities.  (*Id.* at 176).

With regard to vocational functional capabilities, Dr. Tedoff noted that

Plaintiff could follow and understand simple directions and perform simple

tasks, and he found that Plaintiff's attention and concentration skills were

adequate.  (SSA Rec. 176).  Plaintiff told Dr. Tedoff that he felt unable to

maintain a regular work schedule at that time.  (*Id.*).  Dr. Tedoff observed that

Plaintiff had the ability to learn and may be able to "perform somewhat

complex tasks under better emotional and psychiatric circumstances."  (*Id.*).

Plaintiff's decisionmaking skills were "fair."  (*Id.*).  Dr. Tedoff opined that, based

on what Plaintiff had relayed to him, Plaintiff did not "relate adequately with

others and would apparently have significant problems with workplace stress

because of his disability."  (*Id.*).  Dr. Tedoff also reported that the results of his

evaluation were "consistent with psychiatric problems and these may interfere

with the claimant's ability to function in the workplace and in general on a

daily basis."  (*Id.*).  Dr. Tedoff diagnosed anxiety disorder with panic attacks,

---

the exact sequence that they were presented.  An examiner typically beings by having a patient repeat two or three digits, and adding a digit every time the patient correctly recalls the sequence.  "Digits forward" refers to the total number of digits the patient recalls correctly in the exact order presented, while "digits in reverse order" refers to the total number of digits the patient could recall in reverse order.  ROBERT J. SBORDONE, RONALD E. SAULD & ARNOLD D. PURISCH, NEUROPSYCHOLOGY FOR PSYCHOLOGISTS, HEALTH CARE PROFESSIONALS, AND ATTORNEYS 258 (3d ed. 2007).

depressive disorder not otherwise specified,[22] agoraphobia, hypertension, and gout.  (*Id.*).  Dr. Tedoff's prognosis for Plaintiff's ability to look for, obtain, and sustain gainful employment was "guarded."  (*Id.*).

### b.  Dr. Sharon Revan

Dr. Sharon Revan performed a consultative internal medicine examination on May 7, 2012, with a focus on Plaintiff's non-psychological issues.  (SSA Rec. 178-81).  Plaintiff reported having had high blood pressure since 2004.  (*Id.* at 178).  He also reported having chest pain and palpitations, as well as shortness of breath when nervous.  (*Id.*).  Plaintiff stated that he had gout since 2008, which resulted in flareups approximately twice per month that lasted about three to seven days.  (*Id.*).  He reported having heart problems since 2005, and that he had had a heart attack and that he continued to have small ones.  (*Id.*).

Plaintiff stated that he became short of breath from walking half of a block and from climbing five stairs.  (SSA Rec. 178).  He also reported back pain when standing.  (*Id.*).  However, Plaintiff reported no complaints while sitting.  (*Id.*).  Plaintiff stated that he was able to shower and dress himself, although sometimes he needed help with his shirt due to his right shoulder.  (*Id.* at 179).  He told Dr. Revan that he was able to cook and clean, but did not

---

[22]     "Depressive Disorder Not Otherwise Specified includes disorders with depressive features that do not meet the criteria for major depressive disorder, dysthymic disorder, adjustment disorder with depressed mood, or adjustment disorder with mixed anxiety and depressed mood.  Sometimes depressive symptoms can present as part of an anxiety disorder not otherwise specified."  DSM-IV 429-36, *reprinted in* BENJAMIN JAMES SADOCK, M.D. & VIRGINIA ALCOTT SADOCK M.D., KAPLAN & SADOCK'S CONCISE TEXTBOOK OF CLINICAL PSYCHIATRY 231 (3d ed., 2008).

do the laundry or like to go shopping.  (*Id.*).  His daily activities included watching TV, writing, and following up with his doctor.  (*Id.*).  He described himself as a "functional alcoholic."  (*Id.*).

On physical examination, Dr. Revan reported that Plaintiff appeared to be in no acute distress, with a normal gait and the ability to walk on heels and toes without difficulty.  (SSA Rec. 179).  Plaintiff was able to perform a full squat with a normal stance, and he used no assistive devices.  (*Id.*).  Plaintiff needed no help changing for the exam or getting on and off the exam table.  (*Id.*).  He was also able to rise from the chair without difficulty.  (*Id.*).  Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.* at 180).  He did not have scoliosis, kyphosis, or abnormality in the thoracic spine.  (*Id.*).  His lumbar spine showed flexion, 90 degree extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.*).  Straight leg raising was negative bilaterally.  (*Id.*).  Plaintiff had a full range of motion in his shoulders, elbows, forearms, and wrists bilaterally.  (*Id.*).  He had a full range of motion of hips, knees, and ankles bilaterally.  (*Id.*).  He had no evident subluxations, contractures, ankyloses, or thickening.  (*Id.*).  His joints were stable and nontender.  (*Id.*).  He had no redness, heat, swelling, or effusion.  (*Id.*).

Dr. Revan diagnosed depression, anxiety, panic attacks, hypertension, gout, and heart problems.  (SSA Rec. 181).  Dr. Revan determined that Plaintiff's prognosis was "fair," and that in her opinion, Plaintiff had no limitations with his speech, vision, hearing, of the upper extremities for fine

and gross motor activity, or in sitting and lying down.  (*Id.*).  He had mild limitations in walking and climbing stairs due to shortness of breath, in standing due to back pain, and in personal grooming due to his right shoulder pain.  (*Id.*).  Plaintiff also had limitations with activities of daily living secondary to his psychiatric problems.  (*Id.*).

### 3. Dr. T. Harding[23]

Dr. Harding did not personally examine Plaintiff, but based on the consultative professionals' reports completed a Psychiatric Review Technique form on May 15, 2012.  (SSA Rec. 182-95).[24]  Dr. Harding concluded that Plaintiff had a medically determinable impairment but that it did not precisely satisfy the diagnostic criteria of Listings 12.04 or 12.06.  (*Id.* at 185, 187).  Dr. Harding reported that Plaintiff had "moderate" limitations in "activities of daily living," "maintaining social functioning," and in "maintaining concentration, persistence or pace."  (*Id.* at 192).

Dr. Harding also completed a Mental Residual Functional Capacity Assessment.  (SSA Rec. 210-12).  Dr. Harding adopted Dr. Tedoff's assessment of Plaintiff and noted that it was supported by the evidence in the file.  (*Id.* at 212).  Dr. Harding stated that Dr. Tedoff had concluded that Plaintiff could follow and understand simple directions, perform simple tasks, maintain attention/concentration, and make appropriate decisions.  (*Id.*).  However, Dr.

---

[23]    Dr. Harding is only referred to by first initial in the record before the Court.

[24]    The record suggests that Dr. Harding attempted to complete a similar form as of December 31, 2010, but found insufficient information.  (SSA Rec. 196-213).

Harding noted that Plaintiff might have difficulty relating adequately with others and dealing with stress. (*Id.*). Dr. Harding concluded that Plaintiff retains the ability to perform a job with simple and semi-skilled tasks. (*Id.*).

## C.   Plaintiff's Work History

As noted above, Plaintiff obtained a GED, and had most recently worked as a parking garage attendant. (SSA Rec. 27). He worked in this position from 1989 until 2006, and claimed that he was fired, in part, because he was missing too much work due to panic attacks. (*Id.* at 27-28). Plaintiff stated that he was unable to return to work because of the anxiety he felt when he was around others. (*Id.* at 34-35). At the time of his termination, Plaintiff thought he could "easily" find a similar job, but that the recession, in combination with his anxiety, had prevented him from doing so. (*Id.* at 235).

## D.   Social Security Administrative Proceedings[25]

Plaintiff's March 2012 applications for DIB and SSI were denied on May 17, 2012. (SSA Rec. 38-47). Plaintiff then requested a hearing, which was held

---

[25]   The SSA employs a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 416.920(a)(1) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled[.]"). The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [him per se] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform

on April 29, 2013.  (*Id.* at 24-37, 48).  At the start of the hearing, the ALJ noted

that Plaintiff was not accompanied by counsel.  When Plaintiff noted that he

had not "give[n] any thought" to obtaining legal representation, the ALJ offered

to adjourn the hearing for 60 days in order to permit Plaintiff to obtain counsel.

(*Id.* at 26).  Plaintiff considered the matter, but elected to proceed on his own.

(*Id.*).  The ALJ first questioned Plaintiff about his prior employment, as well as

his reasons for terminating that employment.  (*Id.*at 27-28).  The bulk of the

hearing, however, was spent reviewing Plaintiff's proffered medical and

emotional conditions, the treatment he had received and was then receiving,

and the medications he was taking.  (*Id.* at 28-36).  At the conclusion of the

proceedings, the ALJ advised Plaintiff that he (the ALJ) would "evaluate the

evidence and contact these treating sources for their evaluation of your

condition."  (*Id.* at 36; *see also id.* at 240 (subpoena issued by ALJ to JBFCS)).

The ALJ issued his decision on August 27, 2013, finding that Plaintiff

was not disabled.  (SSA Rec. 8-20).  The decision became final on August 27,

2013, when the Appeals Council denied Plaintiff's request for review.  (*Id.* at 1).

In step one, the ALJ considered whether Plaintiff was "engaged in

substantial gainful activity since the alleged disability onset date."  (SSA

Rec. 13).  Preliminary to this inquiry, the ALJ noted that the temporal

---

his past work, the Commissioner then determines whether there is
other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (citing *Talavera* v. *Astrue*, 697
F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her
case at steps one through four," while the Commissioner bears the burden at the final
step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

parameters identified in Plaintiff's application (*viz.*, an onset of disability date of June 10 or December 31, 2006, and an application date of March 25 or 27, 2012), required modification.  (*Id.* at 11-12).  Because Plaintiff applied for and was denied benefits in 2007, the earliest date on which Plaintiff could be found disabled was July 26, 2007, or the day after the date of the prior unfavorable initial determination.  At the back end, Plaintiff had earned quarters of coverage sufficient to be insured for benefits only through December 31, 2010.  Hence, the ALJ noted, entitlement to benefits "is conditioned upon [Plaintiff's] ability to establish that he was 'disabled' on any date during the period from' July 26, 2007, through December 31, 2010.  (*Id.* at 12; *see also id.* at 14).[26]

The ALJ defined "substantial work activity" as work activity that "involves significant physical or mental activity," and "gainful work activity" as work activity "usually done for pay or profit, whether or not a profit is realized." (SSA Rec. 13).  If an individual has engaged in substantial gainful activity since the alleged disability onset date, he may not be found "disabled."  (*Id.*).  The ALJ determined that Plaintiff had not engaged in "substantial gainful activity" since the modified disability onset date of July 26, 2007, as indicated by "[Plaintiff's] April 2013 hearing testimony, attributed assertions, and other evidence of record."  (*Id.* at 15).

---

[26]    The ALJ recognized that SSI benefits did not have a comparable insured status requirement.  However, he found that potential eligibility for benefits could begin no earlier than April 2012, the month following Plaintiff's application.  For this reason, the ALJ considered both whether Plaintiff was disabled on or before December 31, 2010, and, if not, whether he was disabled after March 2012.  (SSA Rec. 12).

After concluding that Plaintiff was not engaged in substantial gainful activity, the ALJ proceeded to step two of the analysis.  The ALJ assessed whether Plaintiff had a medically determinable impairment that was "severe" or a combination of impairments that were "severe."  20 C.F.R. §§ 404.1520(c), 415.920(c).  "An impairment is considered to be 'severe' within the meaning of the Regulations if it imposes significant restrictions upon an individual's ability to perform basic work activities."  (SSA Rec. 13).  Conversely, an impairment is "not severe" when "medical evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work."  (*Id.* (citing 20 C.F.R. §§ 404.1521, 416.921, and Social Security Rulings ("SSRs") 85-28, 96-3p)).  If a claimant does not have a severe medically determinable impairment or combination of impairments, a finding of "not disabled" is made.  (SSA Rec. 13).  The ALJ determined that Plaintiff had the following severe impairments since July 26, 2007:  "gout, by history; hypertension; obesity; generalized anxiety/posttraumatic stress/panic disorder(s), with agoraphobia; specific phobia; and history of polysubstance (including alcohol, cocaine and 'MF'[27]) use/abuse."  (*Id.* at 15).[28]

---

[27]    As noted by the ALJ, Plaintiff "was ostensibly referring to methylfeintantyl, a potent opioid analgesic/'street' drug."  (SSA Rec. 15).

[28]    While the ALJ noted the record evidence of Plaintiff's use of alcohol and illicit drugs, he found no evidence of "any significant functional limitations that persisted for any 12 consecutive months bearing upon such period that may be independently attributed to alcohol or illicit substance use/abuse" (SSA Rec. 15), and thus declined to undertake a determination of the materiality of same (*id.*).  He did, however, consider Plaintiff's continued consumption of alcohol in making his credibility determinations.  (*Id.* at 18).

The ALJ then turned to step three of the analysis.  At step three, the ALJ considered whether Plaintiff "[had] any medically determinable impairment or combination of such impairments that, for any 12 consecutive months during the period at issue, [had] imposed or [was] expected to impose symptoms of a severity that [were] sufficient to meet or medically equal[] the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4."  (SSA Rec. 13).  If the claimant's impairment meets these requirements, a finding of "disabled" is made.  (*Id.*).  The ALJ concluded "that the [Plaintiff] has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal" the relevant criteria.  (SSA Rec. 16 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926)).  With specific respect to Plaintiff's mental status claims, the ALJ found that Plaintiff had failed to present evidence of "any combination of debilitating symptoms that has imposed or is likely to impose any more than 'moderate' limitation upon his ability to carry out daily activities, or upon his abilities as to social functioning, or upon his abilities involving concentration, persistence or pace, or that has resulted in or is likely to result in any repeated episodes of decompensation in a worklike setting."  (*Id.*).

Having determined that Plaintiff was not disabled, and prior to considering step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC").  (SSA Rec. 13).  RFC "defines the extent to which an individual remains capable of performing physical or mental work activity on a sustained

basis despite any ongoing impairment-related limitations." (*Id.*).  After considering the evidence, the ALJ found that Plaintiff "has had medically determinable impairments during the period at issue that could reasonably be expected to produce some of the symptoms that he has alleged." (*Id.* at 17). Nonetheless, Plaintiff "has had at least the [RFC] to perform a wide range of 'medium' exertional work activity that consists of only simple, routine tasks and does not entail a high level of associated stress." (*Id.* at 16).  In making this determination, the ALJ considered the evidence before him, which included reports from Plaintiff's treating and consultative professionals and Plaintiff's own testimony, the latter of which the ALJ credited only in part.  (*Id.* at 17).  The ALJ noted Plaintiff's employment history, as well as Plaintiff's belief that he would easily find another position."  Those facts, coupled with Plaintiff's desultory approach to his previous denial of benefits, the dearth or medical and mental health treatment between 2004 and 2012, and Plaintiff's own statements at the hearing and in his records, did not suggest to the ALJ "the onset of any intractable and permanently disabling mental illness as befalling the claimant when he lost his long-held job in June 2006." (*Id.*).

At step four, the ALJ compared Plaintiff's RFC to his relevant work history.  Because Plaintiff's former job "entailed a level of associated stress that [exceeded] his [RFC] for the relevant adjudicatory period(s)," the ALJ concluded that Plaintiff "lacked the ability to fully perform the requirements of his 'vocationally relevant' past work as a parking/garage attendant." (SSA Rec. 18-19).

26

At step five, the ALJ determined whether there was other work Plaintiff could perform, taking into account his age, level of education, work experience, and RFC in conjunction with the Medical-Vocational Rules of Appendix 2, Subpart P, Regulation No. 4.  (SSA Rec. 19).  The ALJ noted that "if a claimant meets all or substantially all of the exertional demands at a given level of exertion and has no nonexertional limitations, the Medical-Vocational rules direct a conclusion of either 'disabled' or 'not disabled' depending upon the claimant's specific vocational profile."  (*Id.*).  The ALJ determined that because "[Plaintiff] had the RFC to perform the full range of 'medium' exertional work activity" and that "[Plaintiff's] additional, nonexertional limitations … have little or no effect on the significant occupational base of unskilled 'medium work'" that the framework of Medical-Vocational Rule 203.28 directed a finding of "not disabled."  (*Id.*).

## E.    The Instant Litigation

Plaintiff initiated this action on May 29, 2014.  (Dkt. #1).  The Commissioner filed the Administrative Record and her answer on November 10, 2014.  (Dkt. #10, 11).  The parties proceeded thereafter to file competing motions for judgment on the pleadings: the Commissioner filed her motion on November 10, 2014 (Dkt. #12-13), and Plaintiff filed his motion on January 8, 2015 (Dkt. #17-18).

## DISCUSSION

**A.      Applicable Law**

### 1.      Motions Under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering such a motion, a court should "draw all reasonable inferences in [the non-movant's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 548 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

28

### 2.   Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate his "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005). The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

In reviewing the final decision of the Social Security Administration, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard. *Selian* v. *Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("In reviewing a final decision of the SSA, this Court is limited to determining

29

whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (citing *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also id.* ("If there is substantial evidence to support the determination, it must be upheld.").  More than that, where the findings of the SSA are supported by substantial evidence, those findings are "conclusive."  *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard." *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  To make this determination — whether the agency's finding were supported by substantial evidence — "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

## B.    Remand Is Warranted

The ALJ correctly identified the two issues for his determination: (i) whether Plaintiff was disabled under Sections 216(i) and 223 of the Act; and (ii) whether Plaintiff's status requirements of Sections 216(i) were met.  (SSA

Rec. 12).  As to the latter issue, the ALJ found that Plaintiff's earnings record showed that he had acquired sufficient quarters of coverage to remain insured through December 31, 2010.  (*Id.*).  There is no reason to doubt the accuracy of this determination, and the parties do not dispute it.

Proceeding to the primary issue — whether Plaintiff was disabled — the ALJ applied the correct legal standard by employing the five-step evaluation mandated under the regulations.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(b). The ALJ conducted a thorough review of Plaintiff's testimony, his medical records, and the opinions of his treating and consultative physicians.  Plaintiff objects, however, that the ALJ's decision was not supported by substantial evidence, and raises three overarching challenges to his determinations.  The first concerns the ALJ's duty to develop a full and fair record; the second concerns the ALJ's credibility assessments when determining Plaintiff's RFC; and the third concerns the ALJ's reliance on the Medical-Vocational Guidelines.  After reviewing the record, the Court rejects Plaintiff's first and second challenges.  However, the Court believes that the ALJ erred in his step five analysis, and for this reason remands the matter.

1.     **The ALJ Developed a Full and Fair Record**

a.     **The ALJ Appropriately Considered Plaintiff's Pro Se Status**

Plaintiff first contends that the ALJ failed to create a full and fair record because he did not obtain any opinions from Plaintiff's treating psychiatric sources concerning his psychiatric limitations; according to Plaintiff, this

deficiency is all the more striking because he proceeded pro se during the ALJ hearing.  (Pl. Br. 6-9).

The Second Circuit has confirmed that a "social security ALJ, unlike a judge in a trial, must on behalf of all claimants … affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Moran* v. *Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted); *accord Pratts* v. *Chater*, 94 F.3d 34, 37 (2d Cir. 1996).  Furthermore, when a disability claimant is unrepresented, an ALJ's duty to develop the record is "heightened."  *Cruz* v. *Sullivan*, 912 F.3d 8, 11 (2d Cir. 1990).  In particular, the ALJ is required "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *Cruz*, 912 F.3d at 11 (internal quotation marks omitted).  The reviewing court, in turn, must make a "searching investigation of the record" to ensure that the claimant received "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Hankerson* v. *Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (internal quotation marks omitted).

The ALJ took pains to ensure a complete record.  At the start of the hearing, he discussed with Plaintiff the possibility of obtaining counsel, and offered to adjourn the proceedings for 60 days in order to permit Plaintiff to obtain new counsel.  (SSA Rec. 26; *see also id.* at 64, 69-70 (written advice to Plaintiff of right to representation at the ALJ hearing)).  Nothing in the transcript of the hearing suggests that Plaintiff was incapable of evaluating the ALJ's offer; to the contrary, Plaintiff appears quite lucid in the transcript.

Upon securing Plaintiff's waiver, the ALJ discussed with Plaintiff his proffered disabilities; obtained information regarding Plaintiff's mental health treatment; and undertook to obtain records from Plaintiff's treating professionals. (*See id.* at 27-36). The ALJ then issued at least one subpoena for information from JBFCS (*id.* at 240), and plainly considered evidence from treating and consultative professionals in his decision (*id.* at 21-23).

### b.    The ALJ Appropriately Considered the Statements of Mr. Lawton

Relatedly, Plaintiff contends that the ALJ failed to consider properly the evidence from Plaintiff's treating therapist, Andrew Lawton, LMSW. (Pl. Br. 9-10). This, too, is incorrect; the ALJ considered Mr. Lawton's July 13, 2012 progress note (*id.* at 18, 239), his February 13, 2013 letter (*id.* at 17, 148), and his March 2013 evaluation report (*id.* at 23, 288-94). Nor did the ALJ err in his consideration: Specifically, the ALJ correctly noted that Mr. Lawton's February 2013 letter, which sought redesignation of Plaintiff as "homebound," was prepared in order to help Plaintiff obtain public assistance benefits. (*Id.* at 17, 148). More broadly, the ALJ did not err in stating that while he had considered the evidence offered by Mr. Lawton, he "accord[ed] it no controlling weight," because "a licensed social worker is not an acceptable medical source qualified to provide evidence to establish an impairment." (*Id.* (citing 20 C.F.R. §§ 404.1513(a) and 416.913(a))). Indeed, the Second Circuit has held that "the assessment by [a] social worker is ineligible to receive controlling weight because social workers do not qualify as acceptable medical source[s]." *Bliss* v.

*Comm'r of Soc. Sec.*, 406 F. App'x 541 (2d Cir. 2011) (summary order) (internal quotation marks omitted).

### c.    The ALJ Appropriately Considered the Opinions of Dr. Tedoff

Plaintiff's next argument is that the record is not full and fair where the ALJ failed to indicate what weight, if any, was given to the opinion of consultative psychologist Dr. Tedoff.  (Pl. Br. 10).  However, an ALJ's failure to state expressly the weight given to the opinion of a consultative source does not require reversal, so long as the ALJ took the evaluation into account in determining a claimant's RFC.  *Rodriguez* v. *Colvin*, No. 12 Civ. 3931 (RJS) (RLE), 2014 WL 5038410, at *6 (S.D.N.Y. Sept. 29, 2014) (declining to remand where ALJ considered a consultative examiner's assessment in determining plaintiff's RFC, but failed to "assign a specific, quantifiable weight" to the opinion).

Here, although the ALJ did not specify the weight he gave to Dr. Tedoff's opinion, he did engage in a detailed discussion of that assessment that made clear the degree to which he credited it.  (SSA Rec. 17-18).  Among other things, the ALJ noted, and in so doing credited, Dr. Tedoff's findings that Plaintiff "was adjudged capable of following and understanding simple directions and performing simple tasks, with an ability to learn and perhaps perform somewhat complex tasks under better emotional and psychiatric circumstances." (*Id.* at 18).  In other words, from the ALJ's decision, this Court can discern the weight the ALJ gave to Dr. Tedoff's opinion.  (*Id.*).

Plaintiff further contends that, even assuming that the ALJ properly weighed Dr. Tedoff's findings, he misperceived them in arriving at his RFC determination, since "[Dr. Tedoff] opined that [Plaintiff] was unable to maintain a regular work schedule and that he did 'not relate adequately with others and would apparently have significant problems with workplace stress because of his disability." (Pl. Br. 11). Plaintiff argues that the ALJ's failure to provide reasons for rejecting these limitations was reversible error. (*Id.*). The Court disagrees. As an initial matter, Plaintiff is incorrect that *Dr. Tedoff* opined that Plaintiff was unable to maintain a regular work schedule; instead, Dr. Tedoff recorded that Plaintiff himself opined that he "feels unable to maintain a regular work schedule at this time." (SSA Rec. 176). The same can be said for Dr. Tedoff's observation regarding workplace stress: it is couched in the conditional "would" and preceded by the caveat "apparently." (*Id.*). The ALJ took the nature of Dr. Tedoff's finding into account when he remarked, "The *claimant* endorsed inability to maintain a regular work schedule and Dr. Tedoff noted that the claimant *could* have problems with workplace stress." (*Id.* at 18 (emphases added)).

Where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur*, 722 F.2d at 1040 (2d Cir. 1983). Here, the rationale of the ALJ's RFC determination is clear from the record. (SSA Rec. 16-18). The ALJ carefully set

forth Dr. Tedoff's findings that Plaintiff "was adjudged capable of following and understanding simple directions and performing simple tasks," that his "attention and concentration skills are adequate due to the demands of such tasks," and that under better circumstances (i.e., at some other time), Plaintiff would be better able to "perform somewhat complex tasks." (*Id.* at 18). Dr. Tedoff's findings, and the ALJ's assessment of those findings, are consistent with the ALJ's RFC determination that Plaintiff could "perform a wide range of 'medium' exertional work activity that consists of only simple, routine tasks and does not entail a high level of associated stress." (*Id.* at 16).

Other medical evidence in the record brings the ALJ's rationale into sharper focus. In support of his finding, the ALJ noted that Dr. Revan's physical examination showed Plaintiff "to be in no acute distress and to walk with a normal gait," and that the "physical examination of the claimant was essentially benign." (SSA Rec. 18). Moreover, the ALJ considered the evaluations of Ms. Reyes and Dr. Smith, who each assessed Plaintiff a "Global Assessment of Functioning (GAF) of 55, a figure indicative of no more than 'moderate' psychological dysfunction." (*Id.*).[29] The ALJ also discussed the assessment of Dr. Harding, who reported that Plaintiff "[had] good memory and insight, fair to good judgment, and average or above cognition," and described Plaintiff as "'well related' and engaged, spontaneous and goal directed, with no formal thought disorder ('FTD') at all." (*Id.*). Moreover, the ALJ noted that Dr.

---

[29]     Mr. Lawton arrived at a similar conclusion in March 2013. (*See* SSA Rec. 292).

Harding found that Plaintiff "evidenced full affect and euthymic mood" and exhibited no symptoms of panic attack at the time. (*Id.*). Thus, there is no basis to remand because of the ALJ's failure expressly to address the one qualified finding in Dr. Tedoff's assessment.

### d.    The ALJ Appropriately Considered the Opinions of Dr. Harding

Plaintiff next contends that the ALJ failed to "mention the opinions from [Dr. Harding] or indicate what weight was given to these opinions in determining [Plaintiff's] RFC," thus warranting remand. (Pl. Br. 11). This, too, is incorrect. In his decision, the ALJ stated that Ms. Reyes's and Dr. Smith's evaluations of Plaintiff were "consistent with the May 2012 assessment of the State Agency's psychological consultant," i.e., the assessment of Dr. Harding. (SSA Rec. 18). Moreover, although the ALJ did not expressly state the weight given to the opinion (e.g., "little" or "some"), this is not reversible error given the manner in which he addressed the assessment in his decision. *See Rodriguez*, 2014 WL 5038410, at *6.

It is worth noting that even if the ALJ had completely failed to discuss Dr. Harding's assessment, any error would be harmless if written consideration would not have changed the ALJ's determination. *See Arguinzoni* v. *Astrue,* No. 08-CV-6356T, 2009 WL 1765252, at *9 (W.D.N.Y. June 22, 2009) (finding that ALJ's failure to document application of Psychiatric Review Technique was harmless error where it was "not unclear whether the ALJ would have arrived at the same conclusion regarding Plaintiff's RFC" had he done so). Here, Dr. Harding's assessment only bolsters the ALJ's RFC determination. In his

report, Dr. Harding adopted the findings made by Dr. Tedoff, noting that Plaintiff's "[a]ttention/concentration" and "recent/remote memory" were "intact," with "near average" cognitive functioning, "good" insight and "fair judgment." (SSA Rec. 212). Ultimately, Dr. Harding concluded that Plaintiff "retains the ability to perform a job with simple and semi-skilled tasks." (*Id.*). Dr. Harding's assessment accords with the ALJ's RFC determination, and a detailed discussion of it would not have supported Plaintiff's claim.

Plaintiff further argues that whatever weight was given to Dr. Harding's opinion, as a non-examining source his opinion "standing alone is insufficient to constitute substantial evidence." (Pl. Br. 11). Indeed, the Second Circuit has stated that "the opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians." *Havas* v. *Bowen*, 804 F.2d 783, 786 (2d Cir. 1986). However, Plaintiff's premise is simply wrong: the ALJ's RFC determination was based on the findings of several medical sources. The ALJ also considered the findings of consultative physician Dr. Revan, whose physical examination found that Plaintiff "was in no acute distress" and could "walk on his heels and toes without difficulty" and with a "normal" gait. (SSA Rec. 179; *see also id.* at 18). Dr. Revan further found that Plaintiff was able to perform a full squat, "needed no help changing for [the] exam or getting on and off the exam table" and was "able to rise from the chair without difficulty." (*Id.* at 179). Dr. Revan's physical examination, which was "essentially benign," was consistent with the RFC determination. (*Id.* at 18).

38

Further, the ALJ's determination of Plaintiff's mental RFC was supported by JBFCS's evaluating psychiatrist, Dr. Smith, in her May 3, 2012 assessment. The ALJ correctly described Dr. Smith's assessment that Plaintiff had a "good memory," "average or above" cognition, "good" insight, and "fair to good judgment." (SSA Rec. 283; *see also id.* at 18).  He noted her determination that Plaintiff's thinking was "spontaneous and goal directed with no formal thought disorder [ ] at all."  He further noted Dr. Smith's observation that Plaintiff's mood was "euthymic" even if he was "somewhat anxious." (*Id.* at 18).  And as previously discussed, Dr. Tedoff's assessment further supports the ALJ's mental RFC determination.

In sum, the ALJ satisfied his duty to develop the administrative record through careful consideration of medical evidence offered by Plaintiff's treating and nontreating sources.  Moreover, the ALJ's RFC determination was supported by substantial evidence provided by examining physicians Dr. Revan, Dr. Smith, and Dr. Tedoff, as well as the assessment of the non-examining state psychological consultant Dr. Harding.

### 2. The ALJ's Assessment of Plaintiff's Credibility Was Supported by Substantial Evidence

Plaintiff's second category of objections is that the ALJ failed to evaluate his credibility properly when determining his RFC. (Pl. Br. 12-16).  The relevant regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations: first, the ALJ must "decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," and second, if the

39

claimant does suffer such an impairment, "the ALJ must consider the 'extent to which the [claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence'" of the record. *Genier* v. *Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)-(b)).

When a claimant alleges symptoms and a greater restriction of function than can be demonstrated by objective medical evidence alone, the ALJ considers factors including the claimant's daily activities; the type, dosage, effectiveness, and side effects of medications; other treatments or pain relief measures; and other factors. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). However, "[t]he ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *McLaughlin* v. *Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980) (internal quotation marks and citation omitted). The Court will uphold the ALJ's decision to discount a claimant's subjective complaints, such as complaints of pain, so long as the decision is supported by substantial evidence. *See Aponte* v. *Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Moreover, "an ALJ's credibility determination is generally entitled to deference on appeal." *Selian*, 708 F.3d at 420; *see also Torres* v. *Colvin*, No. 12 Civ. 6527 (ALC) (SN), 2014 WL 4467805, at *4 (S.D.N.Y. Sept. 8, 2014) (collecting cases).

Here, the ALJ "considered all of the claimant's alleged symptoms." (SSA Rec. 16 (citing 20 C.F.R. §§ 404.1529 and 416.929, and SSR 96-4p and 96-

7p)).  The ALJ found that although "the claimant has had medically determinable impairments during the period at issue that could reasonably be expected to produce some of the symptoms that he has alleged," his "April 2013 hearing testimony and other attributed assertions of record concerning the intensity, persistence and limiting effects of such impairment-related symptoms are not entirely credible."  (SSA Rec. 17).

The Court finds that there is substantial evidence in the record to support this conclusion.  While Plaintiff stated that he had begun missing work because of panic attacks and anxiety symptoms, he also admitted that he was "having trouble with my position with new management," stating that his employers were "picking on him because he was a bit oppositional" and "macho" about having to perform certain tasks that were not part of his job description, and because he was "not always wearing the right uniform."  (SSA Rec. 17, 27, 235).  Moreover, Plaintiff remarked that he was "glad" that he had been let go and that he would "easily get another similar job" since he had held his prior job for 16 years.  (*Id.* at 17, 235).  Further, while Plaintiff attributed his inability to find a job to the "begin[ning] of the recession" and untreated anxiety problems, the ALJ noted that Plaintiff had begun experiencing anxiety in "his late 20s or early 30s" but "nonetheless remained employed full time until he lost his job at 34 years of age, reportedly thinking that he would easily find another."  (*Id.* at 17, 235, 263).  The ALJ concluded that "such circumstances and evidence do not suggest the onset of any intractable and

41

permanently disabling mental illness as befalling the claimant when he lost his long-held job in 2006." (*Id.* at 17).

In addition, the ALJ determined that "the record contains little or no evidence of mental health or other medical treatment" of Plaintiff in the five-year period between his first unsuccessful application for disability benefits in March 2007 and his reapplication in March 2012. (SSA Rec. 17). Indeed, Plaintiff indicated that he had not been prescribed any of his current medications prior to October 2011. (*Id.* at 17, 149). The ALJ further noted that Plaintiff had told Dr. Tedoff on May 7, 2012, "that he had only seen a psychiatrist for the first time the preceding week, at a juncture shortly after he had reapplied for disability benefits and following a five-year absence from the workforce." (*Id.* at 18). Accordingly, the ALJ's credibility finding is supported by substantial evidence and should not be disturbed.[30]

---

[30]    The ALJ noted in passing that Plaintiff's "ongoing alcohol use in conjunction with psychotropic medications diminishes his credibility and does little to support his claim of intractable, compensable disability." (SSA Rec. 18). The Court did not understand this to be a primary basis for his credibility determination, nor did it understand the ALJ to have concluded that Plaintiff was or is an alcoholic. On remand, the ALJ may consider clarifying either that his credibility assessments do not implicate, or that they accord with, SSR 13-2p, which provides, in relevant part, that:

>    We do not have special rules for evaluating a claimant's credibility in cases involving DAA [drug addiction and alcoholism]. Adjudicators must not presume that all claimants with DAA are inherently less credible than other claimants. We will apply our policy in SSR 96-7p and our regulations as in any other case, considering the facts of each case. In addition, adjudicators must consider a claimant's co-occurring mental disorder(s) when they evaluate the credibility of the claimant's allegations.

SSR 13-2p.

### 3.    The ALJ's Step Five Analysis Requires Remand

Plaintiff lastly objects that the ALJ erred by failing to consult a vocational expert and instead relying solely on the Medical-Vocational Guidelines (the "Grids") in making the step five determination of whether Plaintiff was capable of performing jobs that exist in significant numbers within the national economy.  (Pl. Br. 16-18; *see* SSA Rec. 19 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2)).  The Second Circuit admonishes that where a plaintiff "establishe[s] that his various impairments prevented him from performing his past work, the ALJ ha[s] the burden of proving that [Plaintiff] retained 'a residual functional capacity to perform alternative substantial gainful work which exists in the national economy.'"  *Roma* v. *Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (summary order) (quoting *Bapp* v. *Bowen*, 801 F.2d 601, 604 (2d Cir. 1986)).  "The ALJ ordinarily meets this burden by utilizing the applicable medical vocational guidelines, although sole reliance on the guidelines may be inappropriate where the claimant's exertional impairments are compounded by nonexertional impairments."  *Id.*

The presence of nonexertional impairments does not automatically require the testimony of a vocational expert; rather, the question is whether "a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'"  *Bapp*, 802 F.2d at 605 (quoting *Blacknall* v. *Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983) (per curiam)); *accord Vargas* v. *Astrue*, No. 10 Civ. 6306 (PKC), 2011 WL 2946371, at *13 (S.D.N.Y. July 20, 2011) (citing *Zabala* v. *Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)).  A

43

nonexertional impairment "'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Zabala*, 595 F.3d at 411 (alteration in original) (quoting *Bapp*, 802 F.2d at 605-06).

Plaintiff claims that remand is required because the ALJ "failed to cite any medical evidence or legal authority that the restrictions found do not result in significant non-exertional limitations." (Pl. Br. 17). The Court agrees that remand is warranted, but for a different reason: The ALJ found that Plaintiff had solely nonexertional limitations, and that he retained the ability to perform the full range of "medium" exertional work activity, as long as it did not have a high level of "associated stress." (SSA Rec. 19). While there may be substantial evidence in the record for the ALJ's conclusions regarding the appropriate exertion level (a finding the Court declines to make in light of the remand), the Court finds insufficient guidance in the ALJ's directive concerning "associated stress." After all, Plaintiff's job as an attendant in a parking garage — which involved taking tickets and money from customers, but not actually parking cars — would appear to be on the low end of the employment-related stress continuum. Indeed, Plaintiff himself advised his evaluating psychiatrist that, when posted to a garage not far from his home, Plaintiff "liked" his job because he could "retreat into his 'shell' as he put it of his attendant box, have to speak only very briefly to anyone, and he was able to be

alone so when [he had symptoms of a panic attack, they were] not public." (*Id.* at 236).[31]

The Government may be correct that there are 2,500 separate occupations, all with numerous jobs, that qualify as "medium," "light," and "sedentary" work. (Def. Br. 22 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2, Section 203.00(a))). However, without understanding better the limits the ALJ found with respect to Plaintiff's nonexertional limitations, his conclusions are of limited utility. In other words, while the ALJ did a creditable job in assembling and reviewing the record in this case, his ultimate conclusions regarding the step five analysis (and, more specifically, his inclusion of a restriction on "associated stress" without adequate guidance concerning that restriction) are insufficiently precise to be of use to Plaintiff or the Court. On remand, the ALJ should undertake a more detailed step five analysis, using, to the extent he deems appropriate, a vocational expert.

---

[31]     On remand, the ALJ may, but is not required to, reconsider his step four analysis.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED to the extent of the above-described remand; and Defendant's motion for judgment on the pleadings is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     July 29, 2015
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge